So we will hear argument next in number 222255, Philips North America versus Garmin International. Mr. Thompson. Your Honor, good morning. Elie Thompson on behalf of Philips. If it may please the Court, I'll first discuss the QI patent, the 377, and then the root patent, the 007 patent. In regards to the QI patent, the issue related to circumstantial evidence and whether it was sufficient to overcome summary judgment challenge. The point that was made by Garmin to the District Court, the assertion was, as the Court quoted in the opinion, that Philips had no evidence that any user has ever chosen to exercise out of the activity mode. And that's at Appendix 62. That's the judge's decision. What that meant was that they were asserting that no user, no customer, and there's six million of them, no customer had ever exercised with a watch in its default mode. That's the all-day mode. That's what the watch does by default. Now, they said, actually, Garmin argued, and this is also in their brief, exercising in default mode all by itself would not infringe, right? You have to exercise long enough in that to come to a sync. The watch is automatically designed to sync. By default, every four hours. By default, two conditions, four hours and when you reach 2,000 steps. So, for example, you go to work in the morning, you haven't been exercising, sit at your desk until noon and go and exercise. You go and run 2,000 steps, it's going to sync while you're doing it. That's a very simple example. You're saying that, by happenstance, it could be that somebody is exercising, that they have not turned on the activity tracker, and the sync occurs while they're exercising. Because the sync is triggered by exercise. By default, it's 2,000 steps. I can give you a citation for that. The 2,000 steps is explained at Appendix 2735. It's Martin Paragraph 192, where he explains exactly how these devices operate. They're essentially set to do two things. They will pause for four hours, by default. I'm talking about by default. They will pause for four hours and then, if you become active and hit 2,000 steps, when that occurs, it syncs. And the evidence was that Garmin had encouraged its users to exercise in the default mode and then made even MoveIQ to encourage that. That's why it's there. Because Garmin says to its customer base, we put this MoveIQ in here in order for you to be able to track the different kinds of exercise that we want you to do in the default mode. And then the device... Just on that word encourage, tell me if I understand the following correctly. You have an inducement argument, at least according to the district court's summary judgment opinion, Garmin did argue that the encouragement element of inducement was not met at a separate point from, though obviously somewhat related to, what it tells people that might support or not support an inference that they're all direct infringers. And that the district court did not actually reach that separate point about inadequate evidence of encouragement on Garmin's part. I think that you're correct. Because I think, to me, they're quite distinct points. That is, to reverse on the finding that even on summary judgment there is insufficient evidence of direct infringement, does not mean by itself that Garmin couldn't win on its encouragement, that is, no encouragement argument, which was not ruled on. Right, and I think normally in situations like that, the court will remand. And I think that's what we're suggesting, is that the court should find that there was sufficient evidence, at summary judgment, circumstantial evidence, that the activity had occurred, meaning people had exercised in the default mode and the device was specially designed to sync during that, and then remand it. And that there was encouragement to exercise while syncing, right? Well, as I was saying, the device, and this is explained on the syncing topic itself. Right, so the device is automatically designed. I understand, but doesn't our case law require that for inducement, you have to encourage the performance of the entire claim? So doesn't there have to be encouragement not only to engage in activity without turning on the activity mode or activity tracking, and also that you would want to exercise enough to cause syncing while you're exercising? I think that if I tell you, if I design my device and it operates in a particular way, and it's going to operate that way, and you as a customer don't have any control over that, I don't have to tell you, like, here, I want you to exercise, and by the way, my device does A, B, C, D. If I tell you to do that and that's what the device does, then you've induced the acts of infringement. And our case law is consistent with that, you think? I mean, because I understand what you're saying. That's right, I can give you a site. It's a little bit outside of talking about the case law. We are a little bit outside of the topic here. Because I thought our case law required inducement of all steps of the method claim. It does, but I'm saying that the specific encouragement, if the encouragement is of an activity that covers, because of the operation of the device, those things, because that's the way it's hardwired. You're saying that all that's required is to encourage one step so long as the other steps would automatically follow. Yeah, if I say, use my device, and my device only operates in one way because I have control over it, then I think you have induced the acts of infringement. Exercising by itself, in default mode, does not automatically lead to the performance of all steps. It does only if you get to a sink. Okay, well this is something that the judge did note. Because our expert, Martin, at appendix 2740, this is the evidence. So the evidence before the judge. And again, this is summary judgment. He said, well, not every sink that occurs will happen while the user is exercising. And that's what the judge sees. But he didn't read the rest of the sentence. He didn't use the rest of the sentence. He says, it is inevitable that some sinks will occur during exercise. I guess what I, and I think Judge Stone, what this line of questioning has been about is not disputing that and not, for the moment, suggesting that that's insufficient to infer direct infringement in the mass of customers. I guess I'm just trying to be clear that the separate ground that they argued for summary judgment, which was not moved on by the district court, namely that there is insufficient evidence as a matter of law of encouragement on, based on what they say in the, whatever that thing with the Q is, that that would be an open issue below and requires or may require under our inducement case law, much of it having to do with drug labels, encouragement of all of the steps. That that is a separate issue to be decided. It doesn't follow automatically, even if you win on reversing the summary judgment here, that there is enough evidence of direct infringement. Right, so that issue, the decision was that there was insufficient evidence to show that people were encouraged to exercise. And by the way, we have a list as footnote aid in our brief of a lot of the evidence that talks about. Are you talking about direct infringement or induced infringement now? Well, right now I'm addressing what the decision was, because we're sort of contrasting. Right, which did not talk about induced infringement. That's what I'm saying, because that would be an open issue. We're going to ask new questions about the issue anyway. I understand. Could you answer the question and instead of answer the question asked, instead of telling us what the district court held on it? I'm sorry, I thought I was answering the question. So the question is, they did not address that. And the evidence, we believe, when the judge reviews it on remand, we'll find in our favor that there is sufficient evidence. But you acknowledge that at best. If we remand, you still have to show that there's enough evidence under whatever the proper legal theory is that you encouraged possibly all the steps of the method. You're not here to cite case law on that point, because it wasn't briefed to us, right? Right, exactly. That's what I'm saying. Maybe this would be a good time for you to turn to the 007 package. I just wanted to say 007. Okay, thank you. And I want to say, it's not as much fun, calories burned. Why is calories burned listed in the specification, if it's not meant to be something that the claim is supposed to be able to actually measure? Right, so the expert sort of explains this, right? So we were trying to be precise in the construction of the claim, following the rubric that you take. It's a two-step process. Right, no, we get all that. But the function, the district court said the function includes calories burned and had very solid grounding in the specification for doing that. Is there any reason why calories burned would have been called out in that portion of the specification other than to say, hey, we're going to now disclose structure that allows one of skilled yard to actually do this, measure calories burned? Yeah, we took a conservative view in saying that the identified algorithm, namely the waypoints, the series of waypoints, would lead directly to pace, speed, and distance. I think the specification takes a broader view that those steps could ultimately lead to. Do you agree that there's no structure for calories burned disclosed in your patent? No, I think that calories burned requires additional steps. Which are not disclosed in your patent. Right, right. So we tied it to whether... Therefore, if calories burned is part of the function as properly construed, these claims are indefinite. I think that, so I would disagree with you in this respect. If you take a function, here, it's computing athletic performance feedback data. Then you look for what is the corresponding structure, and the structure is to have a processor running a series of timestamp waypoints from a GPS receiver. And that leads directly to pace, speed, and elapsed distance. Then you have shown corresponding structure to the function. If the function is broader, so there could be additional structures like calories burned, but you don't have corresponding structure that leads immediately to that, then that's not your corresponding structure. So, to my understanding, you would be saying that because there's not corresponding structure in the specification, that means that we should interpret the claim to not include calories burned. That's what would happen as a result of... It's a little bit odd. It creates some weird precedent in this area, doesn't it? Well, I think that it follows specifically what Congress said to do, which is to take the function, which is intended to be broader, and then limit it to its corresponding structure, and that becomes the scope of the claim. One way to make what I think is just the point that Judge Stoll was saying about why it's odd. Our precedent does suggest, I think, or say, that the inquiry is in two steps. You first determine the function as a matter of claim construction, and then you look to see if there's structure that supports it. You don't then say, oh, there isn't structure that supports some of it, and then go back and shrink what you've already construed to be the function so as to avoid the problem. Right, and what I would suggest, Your Honor, is that if you rewrite the claim to say that it requires the calculation of calories burned, that this Court does have precedent to say that that is improper, and actually this Court has explained why. Not that it requires it, but that it includes it. Well, I think that there are multiple cases that this Court has had where the function... If a claim includes something and is indefinite, has to have something, the claim is indefinite. There have been multiple cases from this Court where some embodiments don't have full structure. That has occurred because... What do you think are your best cases? So I think that the best case I would direct the Court to, excuse me for one second, would be... I think that the Siskel case, which is a very recent case from the Court, talks about how there can be embodiments, and I believe that there was one that was broad enough to be covered. This was about aircraft shipping. I think CRC was one. But my other question is, I think this is undisputed, but that calories burned could be calculated using some data in addition to the three-way point data. In other words, the idea of calculating calories burned using the waypoint data is not unheard of. It can be done. It's just you need to have additional data, too. That's exactly our point, right? So when the spec says that the series of time-stamped waypoints from the GPS is used, it's absolutely correct. But we tied it to say that you shouldn't have too many extra steps. The spec needs to say what the extra steps are. And our expert explained that the speed and the elapsed distance and the pace are set forth, and then explained that a person of ordinary skill in the art would know that speed is distance over time. You'd have to supply that information, though, right? No. It would have to be something that they would infer. It's not expressly stated in the specification, for example, the formula for speed. I would suggest that it is, and that would be in Figure 11. It's Appendix 86, and that's mentioned in our brief at Page 6. So Appendix 86, Figure 11 says that current speed, which is when a person of ordinary skill in the art reads the patent and you say speed, they know that speed is miles per hour. And it's actually referenced in the boxes there in the figure. And same thing with pace, it's minutes per mile. And then the expert explained that, and this is Appendix 1017, Martin explains this. The specifications and the claims sufficiently disclose that I'm reading verbatim his testimony, which is unrebutted. The specification and claims sufficiently disclose an algorithm for computing elapsed distance, current or average speed, or current or average pace from a series of time-stamped GPS waypoints. That's Appendix 1017. But he doesn't say calories burned, correct? No, he did not say that. And I'm suggesting why, right? Because he's saying that those are the immediate consequence of the series of time-stamps. So he did not suggest that the additional steps, whatever they may be for calories burned, was specified. And therefore, the claim is limited to what is specified. Okay. Thank you. We'll restore your rebuttal time. Thank you. Mr. Lamkin. Good morning, Your Honors. May it please the Court. My name is Rachel Lamkin, with me is Lauren Dreyer, and we represent the Garmin appellees. Starting with the 377s, Your Honor. Appellant wants to completely ignore a majority of the claim. The claim doesn't say exercise while sinking. The claim says that physiologic status data has to be monitored in real time. And Limitation D says it's monitored and sent to the phone. It's important to take a step back. And as we explained in Appendix 2623, and as admitted by both sides, the accused devices operate in two modes. An all-day data-gathering mode and an inactivity mode. Inactivity is admittedly non-infringing. Phillips doesn't discuss it. The Court spends all of its time on the accused-infringing mode, which is all-day data-gathering mode. And here's what happens. All day, right now, my Garmin watch is gathering my data, including my heart rate, which is a little high here today. And at some point, that all-day data gets synced. If the user uses a phone with their watch, and lots of our users don't use a phone with a watch, again, which is undisputed. If the user, for example, is walking to the store, instead of driving to the store, and it's... Can I interrupt you for a minute? Of course, Judge Schultz. Something you said earlier caught my attention, and I'm not sure that I agree with it. And that's that you said this claim focuses on providing that information at real time. But what I see here is that the physiologic status of the subject is received at least partially while the subject is exercising. That doesn't say real time continuously. What am I missing? Thank you, Judge Schultz. Two things. One is the court below construed the claim to say real time. Phillips doesn't dispute that. But as to your question directly, Your Honor, even some, even a little bit of physiologic status data has to be sent from the watch to the phone to the server, back down to the phone, that's limitation D, while the user is exercising. At least some physiologic status data, at least once, let's say for the sake of argument, at least once, the current physiological status data, for example, my current heart rate, has to be seen on the phone while I'm exercising. That's required to infringe these claims. That never happens with the Garmin watch. As we explained, and as the judge... I thought this appeal just asked us to consider 1F. No, Your Honor. Appellant tries to construe our briefing that way, but we say quite clearly in our brief that's not the case. And we discuss expressly... Did the district court grant you summary judgment based on some limitation other than 1F? No, Your Honor. But 1F, no, and that's all we need. All we need is 1F. 1F says, Your Honor, that physiologic status data is monitored in real time. That's the judge's order on page 65. And the judge carefully, the district court carefully goes through the evidence, cites Dr. Martin, their experts, cites Dr. Martin's admission. There's no physiologic status data in MoveIQ. Cites their own admissions to our statements of unrefuted facts, that there's no real-time data in MoveIQ. Cites, for example, the VIVO Act of 3 manual, which says MoveIQ is only activity and duration. It's important to understand, MoveIQ is just an accelerometer. All it does, and as the district court correctly relied on the evidence, the only thing MoveIQ tracks is my movement. When I started to walk, and when I stopped walking, and that it was a walk. There's no, as the district court correctly found, no physiologic status data in MoveIQ. MoveIQ cannot infringe the claim. Can I ask you, I'm looking at page 83083, for example. This is one of those documents that's cited to say something like, Thanks to Carmen, MoveIQ users don't need to worry about starting or stopping a particular kind of activity for it to get reported. MoveIQ automatically recognizes activities like walking, da, da, da. And then it says, Once synced, these reported activities are viewable as part of the detailed timeline. Now, I understand your point to be, I guess, that that means that it's not going to be received, at least partially, while the subject is exercising. That's the limitation you're relying on, but it seems that perhaps circumstantial, this serves as circumstantial evidence that sometimes it might. It could coincidentally do that, or it could happen if someone exercised at least 2,000 steps. No, Judge Stoll, because as the district court correctly found, there's no physiologic status data in MoveIQ. None. No heart rate data. That is what the district court relied on. Can I just ask, so if you're in default mode and you're exercising, and it happens to be at a four-hour sync interval, what data is sent up to a server and back to the phone? All data since the last time a sync happened. Does that include the heart rate data during that, since the last time? It does, but it doesn't, because it's not physiological status. This patent is about monitoring your physiological, among many things, monitoring your physiologic status at least partially while exercising. I guess I'm maybe confused. So you hit the sync mark. You're running then. You were running the last 10 minutes. There's 10 minutes of heartbeat data, and that's going up to the server and back to the phone. Why isn't that it? Because there's no way to see what my physiological status was. The heartbeat doesn't count. It won't show me what the heartbeat is. It won't show you what the heartbeat is. It won't show you your current status of a heartbeat. It's batched data. There's no way to see physiologic status. There's no way to see what your heart rate was while you were exercising. It's a bunch of historic data, as the district court correctly found, and as the statement of undisputed facts 44 and 45 that he relied on, it's not real-time data. It's batched data, and there's no way to see your heart rate, none, while you're exercising. Explain what you mean more concretely by batched data. I'm imagining that there is a graph or a chart. Is that incorrect? That's incorrect, Your Honor. So what happens with the batched data, and again, this is the statement of undisputed facts relied on by the court. What happens with batched data is it's all the data since the last sync. It doesn't break down what was happening when with all-day data. You just get a dump of data that's been calculated by the server. It's been blended up. You throw all the ingredients, blend it up. That's just making it less precise. What is this data? When I see it, when I hear batch, there's a bunch of data. Now, it's got to be organized in some way. You're telling me that it's not organized in any way to tell that even though you have heartbeat data for the last four hours, that somehow it's in there that you can tell which part of it was the last five minutes? You cannot. So this is the important part. There's no way to tell what the status of your heart rate is in that moment. You will get two things, Your Honor. You'll get a graph. You'll get a picture. So let's say I was walking from noon to 4. On my phone application, I will see a little icon of someone walking from 12 to 4, but it will not tell me what my heart rate was at any one of those moments. This morning, for example, what? Where is that discussed in the district court's appendix? The district court cites at appendix 65, page 16, the district court cites three pieces of evidence. Are you at the bottom of 65, that last paragraph? I am, Judge Starker. Thank you. The judge cites that the data indicating physiological status of a subject is not real-time, then quotes first the VEBO Active User Manual, and Judge Stoll, that's at 3735, and the VEBO Active User Manual explains that the only data you get from MoveIQ is the stop and start times of that activity. No physiologic status data. The next thing that the judge cites is Dr. Martin's depo where he says— I just need to stop you because I guess I'm confused about this. Is it possible to forget about MoveIQ, just completely forget about MoveIQ? I'm running along with my watch. It happens to be a four-hour sync. A whole bunch of—a whole bunch, that's my word for batch. I understand. It goes up and goes back down to the phone. So what is it that tells us that what goes back to the phone does not actually communicate any information about your heartbeat in the last five minutes? That would ask us to prove a negative. It isn't there. The point I'm trying to make is Billups has zero evidence that what you get back is physiological status, the current status of your heart rate, because it doesn't happen. The watches don't work that way. If I want to know, as we explain in our briefing at 2623, if I want to know what my current heart rate is, I look at my watch. And Garmin, as we explained in our briefing, designs it that way. Because imagine this, Your Honors. Imagine if I have to know the current status of my heartbeat while I'm on a run or on a walk. I have to pull out my phone and look at it. I'm going to fall down. My wife says I fall down when I run anyway. But this is a terrible way to design a device. If I want to know my physiologic status, my current heart rate, I look at my watch. Think about this, Your Honor. If the data goes from my watch to my phone to a server back down to my phone, that data is by definition historic. First problem for them, not real time. Second, there's no way to see what my heart rate was, the current status of my heart rate, by doing that operation. Can I ask you also the board and the place that you've identified here cites the Martin deposition transcript. Is that also something that you're relying on for this jury point? Yes, Your Honor. Does that actually state the negative? Yes, Your Honor. From what page would you identify it? If you look at page 31 of our briefing, if you look at page 31 of our opposition brief, I guess it's called a responsive brief here, sorry. On those, on page, everything from 28 to 31, we explain that there's no physiologic status data in the all-day data that we rely on. Even Judge Toronto, taking your hypothetical, if we take out MOVE-IQ and only look at all-day data, there is no physiologic status data in all-day data. I would like to understand exactly where in your red brief you make this argument. We've spent all this time focused on the bottom paragraph of 65. I'm not sure I even understood that that was part of the issues on appeal. If you look at page 4 of our brief, Your Honor, page 4 of our brief talks about the fact that they're designed in the opposite way. That if I want to look… Where are you on for? If I say Garmin's devices are designed to work in the opposite manner, the real-time data in the Garmin system is shown on the face of the device, on the face of the watch. Garmin's world-class training devices are designed not to send… What do you say? I had thought the issue on appeal was that the district court granted Summer Judge a non-infringement because there wasn't enough evidence, he thought, from which to find that there's direct infringement because there's not enough evidence that anybody actually is exercising in default mode at the time of the sink. And I thought that was what their appeal was. And you said he's right. There's not enough evidence of that. You're saying that's not what this appeal is about. No, Your Honor. That's the way Phillips characterizes the decision below. Show me where you characterize it differently, where you tell me what the issue I have to decide is. We say multiple times that… In fact, we've admitted in the briefing, let me find it, Your Honor. We say in the briefing that we admit that people will exercise in all-day mode. That's not the issue. The issue is whether a sink… Sorry, whether physiologic status data… Do you admit that there will be occasions where there will be a sink in default mode while a user is exercising? Watch is capable of doing that. Yeah, but do you admit that there's enough evidence from which a reasonable fact finder could find that that, in fact, happens and has happened? I wouldn't concede that here, but arguendo, let's say that that happens. Let's say that right here I concede, and we're doing it arguendo, right here I concede that a sink occurs while moving in all-day mode. Our point, and we make this multiple times in the brief, that's not what the claim says. The claim doesn't say sink while moving. The claim say physiologic status data has to go in real time to the phone. Right, and I guess I'm just struggling to see where in your brief you say that, which I would take to be an alternative grounds for affirmance than the one that, you know, Phillips asked us to consider. Page 31, Your Honor. Page 31 of our brief. We even say, assume for the sake of argument, some user decides to follow Phillips' dream scenario. And we say, but the claim requires, and in the exact language that I'm talking about, physiological status data on the application at least partially while someone is exercised. And then we say Phillips has proffered zero evidence that this happens. Page 31 details our argument that it's not that someone might exercise while the watch sinks, because the claim doesn't say exercise while sink. I believe 31 clearly covers the argument that I'm making now, Judge Stark, but if you disagree, I'm happy to talk about it. Thank you. Can you get back to the evidence that is cited at the page 65? Your point about the evidence is that, is this evidence that affirmatively indicates that the data that is sent on the sink does not include your last five minutes of heartbeat? Yes. Okay, so the district court below is clearly saying that physiologic status data sent in real time is required in Claim 1. And appellant has provided zero evidence. In fact, is there any evidence that says that whatever data is sent doesn't include physiological data? For example, the Martin deposition testimony transcript, and can you cite to that if it does so? Like an affirmative statement that this is not trial, or this is not in the Garland watch. Yes, that's exactly, yes, Judge Stoll, you're exactly correct. Judge Martin's deposition, that's appendix 2685, where he admits there is no physiologic status data in MOVE-IQ. And is that complete? Yes, because as this court is trying to say, I understand your hypothetical, Judge Tarago, but I just want to know what data is in the data that gets sent up and comes back at a sink in default mode? Notice I did not have to refer to MOVE-IQ. It's all data that the watch collects since the last sink, including heart rate. So my heart rate data But the heart rate data is not organized according to a time scale. It cannot, this physiological status is not collected or reported. It collects the information all day. And displayed on a time scale. Not physiological status data. The only thing, the reason they've allowed MOVE-IQ, the only thing displayed is MOVE-IQ. I can, for example, so when I wake up in the morning, my watch collected data all night. And it will tell me what my average heart rate was. But it will not tell me what my heart rate was at any particular moment. As we explain in our brief, page 31, the only way to see current heart rate is to look at the watch. Any data that gets sent from the watch to the phone, to the server, and back to the phone, it does not show physiologic status data. And I did a terrible job on my briefing if the judges didn't gather that. But I think page 31 clearly conveys that. I'm looking at page 2685. What do you think was the best part of his testimony? The best part of his testimony, 2685, is 12 to 24. There's no physiologic data. I don't know what those numbers mean. I'm sorry, sir? I don't know what those numbers mean, 12 to 24. Oh, sorry, page 164, lines 12 to 24. The mini-transcripts that you guys see. As the district court probably laid out, the claims require real-time physiologic status data. And that's the data that Phillips cannot show exists in all-day data because it doesn't. And the other two things that the district court cites there is DSUF and PSGD. That's correct, Your Honor. That's the appendix statement of undisputed facts. Yes, that is appendix 4146. And what about the other one? The plaintiff's statement of undisputed facts. Yes, so statement of undisputed facts, that's at 4146. I'm sorry, 4146 is not in the joint appendix. 4166. I misspoke. 4166. And those are 44 and 45 of the statement of undisputed facts. And 44 is critical, and the court properly relies on it. MOVE-IQ does not send data in real time. And 45, MOVE-IQ events are only reported after the sink occurs. Correct. Just my reaction upon hearing that or reading that is that doesn't do it because maybe what it sends later is including data from five minutes ago when it sinks. As long as that data tells you what happened five minutes ago, that would be sufficient. If you could get physiological status data in real time while exercising, any amount, once, physiologic status data in real time while exercising on the phone, that would meet this claim. What is this last section on PESGD? That is the plaintiff's affirmance of 44 and 45, which is on, yes, this is on 4166. Also, if the court, I'd like to point out 4159, which is cited in our brief, page 31. At 4159, Statement of the Undisputed Fact 15, this goes to your point, Judge Toronto, the data that gets sent is all data since the last sink. To your point, Judge Toronto, it's all data. There's no way to see while I'm exercising. This doesn't say that. You can send all data and you can see it minute by minute. Yes, Judge Toronto, but the burden is on them to show that that limitation is met and they have no evidence of it. This doesn't deny that. But the court's decision does. But the court points out there's no real time, they have no evidence of real time physiologic status data sent. Where is the district court's construction that requires the real time? Do we have that in our appendix? We do, Your Honor. It's in two places. It's on page 62 of the court's summary judgment order and it's also in the claim construction order, which is at 32. Let's double check that. Sorry, 34 of the appendix. An appellant never contests the court's claim construction that that physiologic status data has to happen in real time. And we have a statement, undisputed fact, not disputed, that the data does not get sent in real time. Well over your time, is there anything that you want to say about the other time? Only as for the 007, which is what I call it as well, sir, that NOAA systems controls, they have to have the full scope of the limitation, and they don't. Thank you. If you need them. Okay, thank you. I think I hopefully could be a little bit briefer than that on this. I think that one thing that struck me is really how the points and arguments have changed. Like what was said to you here and what was said in the district court are completely different things. But I can't address them because they happen to be part of the record anyway. Let me talk about real time. So basically the suggestion I heard argued to you was that real time equated to streaming. And that was an argument made. This is not helping me on what I'm confused about or what I want to hear. I want to hear about the specific point that was asserted that the data collected, the heartbeat data collected over that last four hours, assuming a default sync, that when it's sent up and comes back to the phone, that you don't have any evidence that that data will show the user what his or her heartbeat was the last five minutes. Okay, I will address that. Let me just point out that that wasn't an argument that was made first. But let's take a look at the claim that was asserted. It doesn't say up and back and reviewable and all these things that they're talking about now. The argument that was made in the district court related to a where in clause. It says wherein the data indicating the physiologic status of a subject is received at least partially while the subject is exercising. That was the assertion that there was not evidence of that. Not this. What claim limitation is that and where can we find it? You may find that at appendix 159, which is the patent, claim one, element F, second where in clause. That was the subject of the review for circumstantial evidence. So that's why I say that I think that sort of moving the ball here. I hear what you're saying, but this language at page 865 in the district court's opinion does talk about, you know, displays only the type of activity the user completed in the duration of the activity, not quote data indicating a physiological status of a subject and what time is required by claim one. It does seem to be something the district court talked about. Am I misunderstanding something? Because it's right here on page 865. I think it's what the judge was referring to. It's that the judge was not accepting the evidence that shows that the step was occurred. So what the argument was to you here, I'm trying to join these two because they're sort of two slightly different things. The argument here today was that real time requires something other than receiving a badge that includes current data including heart rate. It was focusing on display and it was saying that it doesn't display it. Well, display isn't in the claim. It's really not in the element that was asserted as not being shown. And I would suggest that wasn't the thrust of the review and that's not what was briefed on appeal. And I don't think that they argue that. I will say that the question of whether heart rate is in the batch that is received, which is what the claim says, is in the batch of data that's received at the automatic sync. I think first of all it was admitted. It doesn't have to be displayed. It was admitted. I think they admitted that it's received. But then I'll also direct you to some appendix materials that show the heart rate. So this is part of Martin's declaration. Appendix 2761, which is a paragraph 234. He shows sort of the heart rate data that's available. This is a screenshot. And then there's another one here where 2759 to 2760. So you started with 2761. I did because that's where the picture is. There's a time scale. There's time and then the heart rate. The horizontal axis, this is a time scale, right? Yeah. So if this is up to the last minute and you know you've been exercising the last 15 minutes, and the vertical scale actually gives you a rate, you can actually see, maybe not second by second, but you can see what your heart rate was while you were exercising in the last five minutes. Is that right? Right. Okay. That's what this is showing as an example. By the way, we have pointed out that the question of whether heart rate is transferred or received wasn't really contested. We pointed that out in the blue brief at page 50, note 16. We actually referenced this. And it's also at the appendix 2625. And so this notion that heart rate data is not sent is just not true. And when a batch is sent, including up to current, and it's received, which is supposed to be sent and it's received, then you're receiving the physiological date of the heart rate. And the circumstantial evidence shows that. What about real time? Is that an issue we have to deal with? Well, the real time means just what the claim says. That's what the court was saying. When you receive something, at least partially while you're exercising, that's occurring in real time with your exercise, meaning like I'm exercising. Even if the data you receive while exercising is all historical? But it's not. The evidence shows that it does have historical, but it's also up to date. That hasn't been contested to my knowledge. It's up to date at that moment. How would you have us read page 31 of the red brief? Are the things that are being argued to us today part of the things that were briefed to us and that we are supposed to be deciding on appeal? Okay. Let me, if you don't mind, I want to actually look at that. Is the red brief 31 that Ms. Lampkin directed us to, to say that the things she's arguing today I should have understood were in dispute on appeal? Yeah. Hold on. 31. Let's take a look. The one full paragraph. She says, yes, I did highlight this while I was sitting there. The argument was that Phillips admits that data sent over periodic automatic syncs in the all-day mode contains all of the data since the last sync. That's true. That's what we say. All of the data, including current. The data packet sent during automatic sync could be data from the last four hours or data from the last four days or all the data since. That's true. It is heart rate and the whole thing and up to current. I don't think that this is arguing that no heart rate is. She says earlier, Phillips has proffered zero evidence that these limitations are met when the watch is in all-day mode, as the district court correctly found. Do you have a substantive response to that? And also, doesn't that put the issue in dispute for us on appeal, whether I realized it or not? I think I've shown the evidence that was provided that shows that the entire package. I don't think that this is really disputed. I think that the parties that are standing here are really not in dispute on this. When the sync occurs, the batch, including heart rate data, is transferred. It's sent. That meets the claim limitation, and the evidence shows that that's what she's saying. There's no physiological status sent in real time when the user is exercising in default mode. That's what she's saying, and that you've presented zero evidence of that. And I showed you evidence. So hold on one second. Is it the evidence you cited when you got up here? Yeah. I mean, that's an example of it. Yeah. If you look at this right here, there's no doubt that heart rate data is sent in that batch. That really is. There's plenty of evidence in this. Can I just double check? The 2761, this is a picture that is between paragraph 230, I guess part of paragraph 234 of the Martin Declaration. That's the other side's expert, right? No, that's not. That's you. You're a Martin expert. Oh, okay. So you're an expert. And this is what it looks like when this is a result of a sync or of something in so-called active mode. Right. This is, I believe that this shows the batch, what the batch is. So I don't see here that it says exactly which way that that occurred. But he does explain that the batch is the batch always. It's always the same batch. They don't change what the batch of data is in one mode versus another. And the same is true, I think, that the other one fairly clearly shows because of what the data is. Let's see. When you say the other one, what are you referring to? The other one that I was referring to is paragraph 233. 2759. 2758. Okay, so 2758 goes to 2759. And so it's these two. So here's the screenshot, and it shows the timescales at the bottom. And it's your heart rate data. So there's two examples showing that the data includes. These are just examples, by the way. There's plenty more evidence in this record. Because, again, like I was saying, this has never really been contested. I think we should call this argument. Okay. Thank you. Thanks. Appreciate it.